**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-6118**

---

UNITED STATES OF AMERICA,

        Petitioner – Appellee,

v.

JAMES DOW VANDIVERE,

        Respondent – Appellant.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  James C. Dever III, District Judge.  (5:15−hc−02017−D)

---

Argued:  October 25, 2023              Decided:  December 8, 2023

---

Before WILKINSON, NIEMEYER, and BENJAMIN, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judges Niemeyer and Benjamin joined.

---

**ARGUED:**  Jeffrey M. Young, HITACHI ENERGY USA INC., Raleigh, North Carolina, for Appellant.  Rudy E. Renfer, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.  **ON BRIEF:**  Sharon Leigh Smith, UNTI & SMITH, Raleigh, North Carolina, for Appellant.  Michael F. Easley, Jr., United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

WILKINSON, Circuit Judge:

James Dow Vandivere appeals the district court order denying his motion for release from civil commitment under the Adam Walsh Act, 18 U.S.C. § 4248. Vandivere was convicted of various crimes involving the sexual exploitation of minors and sentenced to almost twenty years' imprisonment. As he neared the conclusion of his sentence, however, the government moved to civilly commit him, arguing that he remained sexually dangerous and could not be safely released into the community. The district court agreed and ordered that he be committed.

In August 2020, Vandivere filed a motion for discharge. After a hearing, the district court found that he remained sexually dangerous and denied his motion. Vandivere challenges the district court's ruling, arguing that he was wrongly forced to bear the burden of proof at the hearing. He also asserts that the district court erred in determining that he remains sexually dangerous. We reject Vandivere's challenges and affirm the judgment of the district court.

I.

A.

James Dow Vandivere was arrested in 1998 after a decades-long spree of sexually abusing preteen boys. He was roughly fifty years old at the time, aged enough to make his own choices and reckon (or not) with his own misconduct. Yet his victims were often fatherless and wayward, scarcely old enough to shave. Vandivere lured them in with companionship, with money, with promises he would help them fulfill their dreams. He

assured them that the sexual acts they performed together were normal and nothing to be ashamed of. So they acquiesced.

Vandivere's abuse was cut short when he was arrested in May 1998. He was convicted in December 1998 of sexual exploitation of children, certain activities related to material involving sexual exploitation, and transportation of a minor with intent to engage in criminal sexual activity. He was sentenced to nearly twenty years in prison and three years of supervised release. Vandivere entered the custody of the Bureau of Prisons (BOP) and began to serve his time.

## B.

As Vandivere's sentence neared its end, the government feared he could not be safely released into society. In January 2015, the government certified Vandivere as a sexually dangerous person pursuant to the Adam Walsh Act and petitioned the district court to civilly commit him. *See* 18 U.S.C. § 4248(a), (d). That certification triggered the requisite statutory hearing "to determine whether [Vandivere] is a sexually dangerous person." *Id.* § 4248(a). At that hearing, the government was required to demonstrate by clear and convincing evidence that: (1) Vandivere "engaged or attempted to engage in sexually violent conduct or child molestation," *id.* § 4247(a)(5) (the "prior conduct" element); (2) Vandivere "suffers from a serious mental illness, abnormality, or disorder," *id.* § 4247(a)(6) (the "serious mental illness" element); and (3) Vandivere "would have serious difficulty in refraining from sexually violent conduct or child molestation if released" as a result of his disorder, *id.* (the "serious difficulty" element). In November

3

2016, the district court found that the government had met its burden, and Vandivere was civilly committed to the custody of the BOP. *See id.* § 4248(d).

C.

In August 2020, after nearly four years of civil commitment, Vandivere filed a motion via 18 U.S.C. § 4247(h) seeking a discharge hearing before the district court in order to argue he was no longer sexually dangerous and could be released. Section 4247(h) is silent as to the burden of proof in this hearing. Vandivere filed a motion in limine contending that the burden of proof at the discharge hearing should be the same as at the initial commitment hearing: the government would bear the burden of proving Vandivere's sexual dangerousness by clear and convincing evidence. The government disagreed, asserting that the burden had shifted to Vandivere to prove he was no longer sexually dangerous by a preponderance of the evidence.

The discharge hearing was held in May 2021. At the outset, the district court denied Vandivere's motion in limine and agreed with the government that Vandivere had the burden to demonstrate he was no longer sexually dangerous by a preponderance of the evidence. Vandivere conceded the first element of the sexual dangerousness test (the prior conduct element), but disputed elements two (the serious mental illness element) and three (the serious difficulty element). Five witnesses testified at the hearing. Because one of Vandivere's claims challenges the district court's assessment of this testimony, we think it proper to give an overview of that testimony here.

4

Three psychologists testified as expert witnesses. Dr. Gary Zinik and Dr. Dawn Graney testified on behalf of the government, and Dr. Luis Rosell testified on behalf of Vandivere.

Dr. Zinik, a clinical forensic psychologist, testified on behalf of the government. He opined that Vandivere continued to satisfy the elements of sexual dangerousness. As for the serious mental illness element, he diagnosed Vandivere with (a) other specified paraphilic disorder, hebephilia; and (b) other specified personality disorder, antisocial and narcissistic features. Hebephilia is a term used to describe adults with an enduring sexual interest in children around the age of pubescence. J.A. 216–17. Dr. Zinik testified that a diagnosis of hebephilia was proper for Vandivere because he suffered from a lifelong sexual preference for boys who are immediately post-pubescent or just prior to pubescence, typically preying on boys ages ten through fifteen. He discussed the harms to Vandivere's victims and how Vandivere targeted disadvantaged, homeless, and runaway boys. Regarding Vandivere's antisocial and narcissistic features, Dr. Zinik emphasized Vandivere's lack of remorse for his victims and his persistent failure to take responsibility for the harm he had wrought.

As for the serious difficulty element, Dr. Zinik stressed that Vandivere was not safe to be released. He conceded offenders older than sixty are typically unlikely to reoffend, and that Vandivere's age of seventy-two weighed in his favor. Dr. Zinik emphasized however, that, while rare, recidivism in older sex offenders occurs. Dr. Zinik referred to these individuals as "rare birds." J.A. 230. He testified to his belief that "Mr. Vandivere is one of those rare birds. He is one out of a hundred, maybe one out of a thousand, maybe

5

one out of a million." *Id.* He emphasized that Vandivere showed several dynamic risk factors that exacerbated his likelihood of recidivism, including Vandivere's emotional identification with children, his poor problem-solving skills, his tendency to lie, and his distorted understandings of what constitutes sexual abuse. On this last risk factor, Dr. Zinik reported that Vandivere had recently confessed that he did not believe pubescent boys were children and that sex with a pubescent boy was not abuse. In sum, Dr. Zinik stressed that Vandivere was "one of those rare birds that we need to protect the community from" because of Vandivere's "current definition of sexual abuse, his current lack of understanding of his own offending history and the damage he caused, his current belief that he still wants to help teenage boys, [and] his current belief that he sees no reason why he shouldn't have contact with teenage boys." *Id.* at 230–31.

Dr. Graney, a psychologist for the Federal Bureau of Prisons, also testified on behalf of the government. As for the serious mental illness element, she diagnosed Vandivere with (a) other specified paraphilic disorder, hebephilia; and (b) other specified personality disorder, antisocial features. With respect to hebephilia, Dr. Graney emphasized that Vandivere had an extended history of preying on thirteen-, fourteen-, and fifteen-year-old boys, using drugs, pornography, or employment to groom them before escalating to sexual abuse. She detailed how Vandivere's fifty-plus years of deviant sexual interest in pubescent boys caused immense harm to his victims. With respect to Vandivere's antisocial features, Dr. Graney stressed Vandivere's repeated criminal conduct, deceitful character, lack of remorse, and history of impulsive behavior. She acknowledged that some individuals age

6

out of antisocial and narcissistic behaviors but stressed that Vandivere had not shed these tendencies even in his late age.

As for the serious difficulty element, Dr. Graney acknowledged that Vandivere was in the "advanced-age category" and that research shows "a very low risk of reoffense for that age category." J.A. 190. Nonetheless, she pointed out that it is important to consider a sex offender as an individual and take his personal characteristics into account when assessing sexual dangerousness. Based on a holistic consideration of Vandivere's case, Dr. Graney agreed that Vandivere was a "rare bird." J.A. 204. While she admitted that rare-bird status was a subjective determination, she emphasized that Vandivere's persistent denial of responsibility and refusal to receive sex offender treatment while in custody differentiated him from other sex offenders of his age. She likewise pointed out that over a fifty-year period, Vandivere's attitudes and beliefs about sexual abuse had not meaningfully changed.

Dr. Rosell, a clinical and forensic psychologist, testified on behalf of Vandivere. As for the serious mental illness element, Dr. Rosell argued that hebephilia could not serve as valid grounds for a civil commitment. He explained that the diagnosis was "controversial because there's no specific criteria for evaluators to make a determination whether it's present or not," and that it was not recognized in the fifth edition of The Diagnostic and Statistical Manual of Mental Disorders (DSM-V). J.A. 134. He emphasized Vandivere's rule-abiding behavior while in custody was an indication that his antisocial conduct may have diminished with age. As for the serious difficulty element, Dr. Rosell opined that Vandivere was not likely to reoffend. He testified that extensive research conducted over

7

the preceding fifteen years had demonstrated that sex offenders older than sixty have a reduced rate of recidivism, and that offenders older than seventy have an even lower rate. Citing various studies, he put Vandivere's risk of recidivism at 5.9 percent. He testified that that "no matter how you look at it in terms of risk, there's never more than a 10 percent recidivism rate. It's always in the single digits." J.A. 133.

Regarding Vandivere's refusal to participate in sex offender treatment while in custody, Dr. Rosell testified that such treatment does reduce recidivism rates, but that the recidivism rates of those who do not undergo such treatment are still not very high. He dismissed reliance on dynamic risk factors, contending that most of these are generally not strong predictors of recidivism. He again pointed to Vandivere's compliant behavior while in custody as evidence that he could control his conduct if released. However, Dr. Rosell did concede that Vandivere had a history of lying to authorities, had molested children while out on supervision in 1971, and had indicated distorted understandings of sexual abuse.

As for lay witness testimony, Vandivere testified on his own behalf, as did his long-time friend, Denton Scott Wilson.

In his testimony, Vandivere admitted to engaging in inappropriate sexual contact with ten minors between 1966 and 1978, and then again with more minors in the 1980s and 1990s. However, he continued to deny any inappropriate sexual contact with the boys he was convicted of molesting in 1971 and asserted the boys concocted the allegations. He stressed that he had not engaged in sexual contact with a minor for at least twenty-three years. However, he admitted that he told Dr. Zinik he believed that as long as children were

8

growing pubic hair and understood right from wrong, they were old enough to consent to sexual relationships. When asked why he had repeatedly declined sex offender treatment while in custody, he claimed that he did not trust the prison therapists. However, he stressed that he "absolutely" would comply with such treatment if it were ordered as a condition of his release. J.A. 83.

Denton Scott Wilson also testified on behalf of Vandivere. Wilson met Vandivere in 1989, when Wilson was eighteen years old. Wilson was friends with one of Vandivere's victims. Vandivere was never sexually inappropriate with Wilson, and Wilson was unaware at the time that Vandivere was abusing minors. Wilson owned a cabin in a remote area of Washington State and offered it to Vandivere as a place to live if he were discharged. This cabin was six hours away from where Wilson lived. Wilson testified that he would report Vandivere if he ever learned about Vandivere abusing a minor.

## D.

The district court orally announced its findings of facts and conclusions of law on the record in December 2021. It stated that it "reviewed the entire record and all exhibits from both Vandivere's original trial and from Vandivere's Section 4247(h) trial," and that it "made credibility determinations concerning the witnesses who testified at the 4247(h) trial." J.A. 260. The court also considered various reports the experts had prepared after evaluations of Vandivere. The court then explained that Vandivere had failed to meet his burden of proving he was no longer sexually dangerous.

As for the serious mental illness element, the district court found persuasive Dr. Zinik's and Dr. Graney's diagnoses of hebephilia and other specified personality disorder,

antisocial and narcissistic features. Regarding the serious difficulty element, the district court found that Vandivere failed to demonstrate he would not have serious difficulty in refraining from child molestation if released either unconditionally or conditionally. Its analysis focused on "Vandivere's volitional control in light of such features of the case as the nature of the psychiatric diagnoses and the severity of his mental illnesses, abnormalities, or disorders, in such a way that distinguish Vandivere from the dangerous but typical recidivist convicted in an ordinary criminal case." J.A. 294 (citing *Kansas v. Crane*, 534 U.S. 411, 413 (2002)). The court emphasized that this determination "requires more than relying on recidivism rates of past offenders but requires an analysis of a range of different factors." J.A. 293. The court thus considered the record as a whole,

> including Vandivere's [prior] failure on supervision, his resistance to treatment, his medical conditions, his age, his long-standing and continued deviant thoughts, his cognitive distortions, his impulsivity, his actuarial risk assessment, his dynamic risk factors, his lack of credibility, his conduct while incarcerated, and the historical nature of his offenses, both sexual and non-sexual.

J.A. 295.

Additionally, the court gave "greater weight to the persuasive opinions of Drs. Graney and Zinik" than to the opinion of Dr. Rosell, as "[t]heir analysis of Vandivere's sexual dangerousness [was] more thorough, better reasoned, better supported by the record, and better supported by research, especially in light of the factors" the Fourth Circuit has found relevant to an analysis of sexual dangerousness. J.A. 296.

10

In sum, the district court concluded that Vandivere had failed to show by a preponderance of the evidence that he was no longer sexually dangerous and denied his motion for discharge.

Vandivere timely appealed the order of the district court. He argues that the district court erred in making him shoulder the burden of proof at his discharge hearing. Vandivere also challenges the district court's conclusion that he remains sexually dangerous.[*] We review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Hall*, 664 F.3d 456, 462 (4th Cir. 2012).

## II.

This case principally concerns the Adam Walsh Child Protection and Safety Act of 2006, codified at 18 U.S.C. § 4248. Enacted in the wake of the gruesome kidnapping and murder of six-year-old Adam Walsh, the statute aims to "protect children from sexual exploitation and violent crime, to prevent child abuse and child pornography, to promote Internet safety, and to honor the memory of Adam Walsh and other child crime victims." Pub. L. No. 109-248, 120 Stat. 587. Among other provisions, the Act created novel sex-

---

[*] Vandivere also asserts that the government lacks standing in the present action. But we can easily reject this claim. The injury to the government here is the potential release of a sexually dangerous person into society. *See United States v. Searcy*, 880 F.3d 116, 124 (4th Cir. 2018) (explaining that in an Adam Walsh Act commitment proceeding, "the government is exercising its constitutional power to civilly commit an individual for the protection of the public at large"); *Stauffer v. Brooks Brothers, Inc.*, 619 F.3d 1321, 1325 (Fed. Cir. 2010) (holding Congress can enact legislation which "define[s] an injury in fact to the United States" and noting "the government would have standing to enforce its own law"). This injury is traceable to Vandivere's prior conduct as a sexual predator and the district court's finding that he remains sexually dangerous. And it is likely to be redressed by his continued commitment.

11

offender registration and notification requirements; strengthened various laws penalizing sexual and violent crimes against children; and, pertinent here, instituted a procedure for federal civil commitment of sexually violent predators.

Civil commitment under the Adam Walsh Act applies to individuals who are already in the custody of the BOP, such as Vandivere; who are committed to the custody of the Attorney General because they have been deemed incompetent to stand trial pursuant to 18 U.S.C. § 4241(d); or who have had their criminal charges dropped solely because of their mental condition. 18 U.S.C. § 4248(a). The Attorney General, his designee, or the Director of the BOP may certify an individual falling into one of these categories as "sexually dangerous" and petition a federal district court to order that person's civil commitment. *Id.* Certification automatically stays that person's release from federal custody until a hearing where the district court determines whether the individual is in fact "sexually dangerous." *Id.* At this initial commitment hearing, the government bears the burden of proving that the individual is sexually dangerous by clear and convincing evidence. *Id.* § 4248(d). If the government prevails, the person is taken into the custody of the Attorney General, who arranges for detention and treatment. *Id.*

A person who has been civilly committed pursuant to the Adam Walsh Act has several avenues to discharge. For example, the committed individual may collaterally attack his detention via habeas corpus. *Id.* § 4247(g). Another avenue comes from within the Act itself. Under § 4248(e), when the director of the facility in which the person is being housed determines that the "person's condition is such that he is no longer sexually dangerous to others, or will not be sexually dangerous to others if released under a

prescribed regimen" of treatment, the director "shall promptly file a certificate to that effect" in the district court. The district court then either orders the discharge outright or holds a hearing to determine whether discharge is appropriate. *Id.*

Vandivere himself pursued discharge under a related statute, 18 U.S.C. § 4247(h). This provision provides a channel for a variety of committed people, including Adam Walsh detainees, to challenge their commitments. Under § 4247(h), the committed person may move for a discharge hearing "at any time during such person's commitment" and, if denied discharge after the hearing, renew the motion every 180 days. At the hearing contemplated in § 4247(h), "[t]he person shall be afforded an opportunity to testify, to present evidence, to subpoena witnesses on his behalf, and to confront and cross-examine witnesses who appear at the hearing." *Id.* § 4247(d). The person "shall be represented by counsel" and will be appointed counsel if "he is financially unable to obtain adequate representation." *Id.*

As recounted above, Vandivere was given a hearing before the district court after filing a § 4247(h) motion. At the conclusion of this hearing, the district court found that Vandivere failed to establish he was no longer sexually dangerous and ordered he remain in civil commitment. We turn now to Vandivere's challenges to the district court's decision.

### III.

Vandivere challenges the district court's ruling on two grounds: (A) that the district court wrongly forced him to bear the burden of proof and (B) that, regardless of the burden of proof, the district court improperly weighed the evidence. We take each in turn.

13

A.

Vandivere argues that the district court erred when it forced him to bear the burden of proving he was no longer sexually dangerous by a preponderance of the evidence, and in doing so violated his due process rights. He maintains, as he argued in his motion in limine below, that the burden should have been on the government to show that he remained sexually dangerous by clear and convincing evidence.

We disagree. The statute and our precedents make clear that the burden of proof at an Adam Walsh discharge hearing is just as the district court said: the detainee must show he is no longer sexually dangerous by a preponderance of the evidence. And despite Vandivere's protests, the Supreme Court's due process decisions do not make that allocation unconstitutional. In the sections below, we start with the statutory framework before moving to Vandivere's due process arguments.

1.

There are really two questions here. First, *what* is the *standard* of proof? Second, *who* bears the *burden* of proof?

The statutory scheme confirms that the proper standard of proof at an Adam Walsh discharge hearing initiated via § 4247(h) is a preponderance of the evidence. It is true that § 4247(h) itself is silent about the standard of proof that attaches to a detainee-initiated hearing. The Adam Walsh Act *is* clear, however, as to the standard of proof in director-initiated hearings under § 4248(e): "If, after the hearing, the court finds by a preponderance of the evidence that the person's condition is such that" he is not sexually dangerous or can

14

be safely "released under a prescribed regimen" of treatment, the court shall order discharge. In Adam Walsh Act cases, this circuit has consistently read § 4247(h) as a vehicle to access the discharge hearing delineated in § 4248(e). *See United States v. Maclaren*, 866 F.3d 212, 218 (4th Cir. 2017) (referring to a § 4247(h) motion as a "motion for a § 4248 discharge hearing"). Section 4248(e)'s standard of proof thus applies to hearings initiated by § 4247(h) motions as well. *See Searcy*, 880 F.3d at 120 (applying the § 4248(e) standard of proof to a hearing initiated by a § 4247(h) motion); *United States v. Comstock*, 627 F.3d 513, 516 (4th Cir. 2010) (same).

Applying the standard of proof we find in § 4248(e) to hearings initiated via § 4247(h) is sound. Although the vehicle by which the discharge hearing is initiated may differ, the destination is the same: a hearing, conducted with the safeguards set out in § 4247(d), where the district court determines if the detainee can be released. It is altogether unclear why the standard of proof would change because the director is advocating on behalf of the detainee, rather than the detainee advocating on behalf of himself. We thus agree with the district court that the proper standard of proof in a discharge hearing is a preponderance of the evidence.

That leaves us with the question of *who* bears the *burden* of proof. Because "[t]he statute speaks in terms of showing recovery, rather than asking the government to prove non-recovery," *United States v. McAllister*, 963 F. Supp. 829, 833 (D. Minn. 1997), we readily conclude that the detainee is the one who must offer such proof. It would not make sense to place on the government the burden of proving precisely what it disagrees with: "that the committed person is no longer sexually dangerous." *United States v. Wetmore*,

15

812 F.3d 245, 248 (1st Cir. 2016). The language of the statute thus indicates that the burden should fall on the committed individual.

A burden-shifting framework makes sense here. By the time we get to a discharge hearing, the government has already met its initial burden of proving that the individual is sexually dangerous by clear and convincing evidence at the time of confinement. *See id.* The burden then logically shifts to the committed individual to prove he has recovered. *See United States v. Barrett*, 691 F. App'x 754, 755 (4th Cir. 2017). The committed individual is the one who seeks to alter the status quo, and in our system "the person who seeks court action should justify the request." C. Mueller & L. Kirkpatrick, Evidence § 3.1, p. 104 (3d ed. 2003). "Absent some reason to believe that Congress intended otherwise, therefore, we will conclude that the burden of persuasion lies where it usually falls, upon the party seeking relief." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 58 (2005).

Our interpretation is confirmed by the treatment of a similar statute, 18 U.S.C. § 4246, which concerns the civil commitment of mentally ill individuals whose release into society would create "a substantial risk of bodily injury to another person or serious damage to property of another." *Id.* § 4246(a). Like the Adam Walsh Act, this statute permits the director of the facility in which the individual is being housed to certify that the individual's release would no longer pose a danger to society. Certification triggers a hearing where if the court "finds by a preponderance of the evidence that the person has recovered" from his mental illness to the extent that he is no longer dangerous, the court shall order discharge. *Id.* § 4246(e). And detainees committed pursuant to § 4246 can move for their own discharge via § 4247(h), just as Adam Walsh detainees can. Courts that have

16

considered the issue have thus concluded that § 4247(h) movants seeking to be released from § 4246 custody bear the burden of proving they no longer pose a danger to society by a preponderance of the evidence. *United States v. Evanoff*, 10 F.3d 559, 563 (8th Cir. 1993); *McAllister*, 963 F. Supp. at 833; *United States v. Taylor*, 513 F. App'x 287, 290 (4th Cir. 2013) (per curiam); *United States v. Anderson*, 104 F.3d 359 *5 n.12 (4th Cir. 1996) (unpublished). The same goes for § 4247(h) movants seeking to be released from Adam Walsh Act custody.

## 2.

Vandivere asserts that, regardless of what the statute mandates, forcing detainees to bear the burden of proof at their own discharge hearings violates their due process rights. The proper allocation of burdens of proof in a given statutory scheme is a question of procedural due process. *See, e.g.*, *Addington v. Texas*, 441 U.S. 418, 425 (1979); *Santosky v. Kramer*, 455 U.S. 745, 758 (1982). We therefore look to the three factors elucidated in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), for guidance: (a) "the private interest . . . affected by the official action," *id.*; (b) "the fairness and reliability of the existing . . . procedures, and the probable value, if any, of additional procedural safeguards," *id.* at 343; and, finally, (c) "the public interest," which "includes the administrative burden and other societal costs" that would accompany the requested procedure, *id.* at 347. While *Mathews* has the drawbacks of indeterminacy, it has the virtues of balance, which seem especially appropriate to this setting.

*a. The private interest at stake.*  The Supreme Court "repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that

17

requires due process protection," *Addington*, 441 U.S. at 425, and that "[f]reedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). It cannot be denied, then, that the private interest at stake is a weighty one. But "that liberty interest is not absolute," *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997), and the governmental interest in protecting the public from mentally disturbed and sexually dangerous detainees should not be minimized. *See Mathews*, 424 U.S. at 340–43.

*b. Evaluation of existing procedures; value of potential additional safeguards.* Congress, in enacting the Adam Walsh Act, provided detainees with a number of guardrails. Start with the initial civil commitment hearing, in which procedures "differ substantially from those that apply to a run-of-the-mill civil case in that they afford individuals rights traditionally associated with criminal proceedings, including the right to appointed counsel, the right to confront witnesses, and a heightened burden of proof." *Searcy*, 880 F.3d at 125.

Even if the government is successful in the initial commitment proceeding, the individual is not condemned to indefinite confinement. He has access to various avenues for relief, *see supra* Part II, one of which is renewable by the detainee himself, 18 U.S.C. § 4247(h), and one of which permits his caretakers to advocate on his behalf, *id.* § 4248(e). In both proceedings, the individual bears a lesser burden to earn his discharge than the government bore to secure his confinement. And both proceedings come with the safeguards set out in § 4247(d). Finally, an individual has the option to collaterally attack his confinement. *Id.* § 4247(g). In this way, Congress aimed to strike a balance between

18

respecting individual liberty on the one hand and protecting the citizenry at large on the other. Courts should not lightly overturn what was obviously a thorough and concerted effort on the part of a coordinate branch of government to weigh the personal and public stakes at issue.

*c. The public interest.* If the government were forced to hold more frequent or more elaborate hearings, even if the detainee had little evidence of his rehabilitation, the government would bear an unnecessary hardship. At the very least, it would require the government to repeatedly recall the same expert witnesses and make the same claims about the detainee's behavior patterns. Placing the burden on the detainee at each discharge hearing helps to prevent such needless and wasteful repetition, as a hearing will only prove beneficial to the detainee if he can persuade the court that circumstances have changed such that he can be safely released. The existing scheme has the additional side effect of breeding positive incentives: the detainee is encouraged to participate in treatment while in commitment, so that he has proof of recovery at a subsequent discharge hearing. Shifting the burden to the government would eviscerate these positive incentives and undermine the statute's general thrust towards rehabilitation.

On balance, therefore, the *Mathews v. Eldridge* factors demonstrate that the allocation of the burden of proof on an Adam Walsh Act detainee complies with the Due Process Clause.

Vandivere, however, tried to avoid the *Mathews* inquiry entirely by invoking three Supreme Court precedents in support of his claim: *Addington v. Texas*, 441 U.S. 418

19

(1979); *Foucha v. Louisiana*, 504 U.S. 71 (1992); and *Kansas v. Hendricks*, 521 U.S. 346 (1997). None of these precedents can bear the weight Vandivere attempts to place on them.

Start with *Addington*. There, the Supreme Court considered the constitutionally requisite standard of proof in initial civil commitment proceedings. 441 U.S. at 419–20. The Court held that to civilly commit an individual in the first instance, the government must prove by clear and convincing evidence that the individual is mentally ill and dangerous. *Id.* at 431. This "middle level of burden of proof" between a preponderance of the evidence standard and a proof beyond a reasonable doubt standard strikes "a fair balance between the rights of the individual and the legitimate concerns of the state." *Id.*

*Addington* does little to help Vandivere. No one disputes that the government has the burden of proof in the initial commitment proceedings, a burden it met here. And nothing in *Addington* indicates that the government must be forced to bear this burden each time a civilly committed individual moves for discharge, which could be as often as every 180 days. 18 U.S.C. § 4247(h).

Vandivere next argues that *Foucha* established the principle that "in matters involving civil commitment, the burden must at all times be on the Government." Appellant's Br. 29. But *Foucha* said no such thing. In *Foucha*, a criminal defendant was committed to a psychiatric hospital on the grounds that he was mentally ill and dangerous after being found not guilty by reason of insanity. 504 U.S. at 73–74. At a subsequent discharge hearing, the state no longer contended he was mentally ill, and thus sought to confine him indefinitely based on dangerousness alone. *Id.* at 75, 80. The Supreme Court held that for indefinite civil commitment to be justified, the state must at all times contend

20

that the detainee is both mentally ill and dangerous. *Id.* at 77, 83. Here, the government continues to assert that Vandivere remains both mentally ill and dangerous; indeed, the government put forth evidence at Vandivere's discharge hearing to attest to exactly that.

Finally, Vandivere points to *Hendricks* as establishing that, for a civil commitment scheme to be constitutional, the state cannot shift the burden of proof at discharge proceedings to the detainee. But this is too broad a reading of the case. *Hendricks* concerned a state law predecessor of the Adam Walsh Act. 521 U.S. at 350. In describing the statute, the Court noted that "[i]n addition to placing the burden of proof upon the State, the Act afforded the individual a number of other procedural safeguards." *Id.* at 353. In subsequent discharge proceedings, "[i]f the court found that the State could no longer satisfy its burden under the initial commitment standard, the individual would be freed from confinement." *Id.*

From this description of the statute, Vandivere tries to extract a constitutional rule. He posits that the statute's lack of burden shifting was a necessary condition of its constitutionality. But the Court's ultimate conclusion that the statute complied with the Due Process Clause did not rest on burdens of proof. Rather, the Court upheld the statute against a challenge that it ran counter to *Foucha* and *Addington* because it allowed for civil commitment of those with a mere "mental abnormality," a "term coined by the Kansas Legislature," rather than those with a "mental illness." *Id.* at 358–59. The Court rejected this assertion, holding that "the term 'mental illness' is devoid of any talismanic significance." *Id.* at 359. Because the statute "require[d] a finding of future dangerousness, and then link[ed] that finding to the existence of a 'mental abnormality' or 'personality

21

disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior," the statute complied with the Due Process Clause. *Id.* at 358. The statute's lack of burden shifting simply did not play into the Court's analysis.

None of the precedents Vandivere cites, then, render the Adam Walsh Act constitutionally suspect, and we decline to read into the meticulous efforts of Congress constitutional problems where there are none. Unwinding these interrelated efforts either piecemeal or wholesale would produce a perfect mess. We therefore agree with the district court and hold that, in an Adam Walsh Act discharge hearing, the detainee bears the burden of proof to show his recovery by a preponderance of the evidence.

IV.

Vandivere next contends that, regardless of the burden of proof, the district court erred in concluding that he remained sexually dangerous.

We review the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Charboneau*, 914 F.3d 906, 912 (4th Cir. 2019). The clear error standard preserves the district court's role as the primary fact finder. Thus, a reviewing court is not entitled to reverse factual findings merely because it might have weighed the evidence differently. *United States v. Wooden*, 693 F.3d 440, 451 (4th Cir. 2012). Further, "[e]valuating the credibility of experts and the value of their opinions is a function best committed to the district courts," and the reviewing court "should be especially reluctant to set aside a finding based on the trial court's evaluation of conflicting expert testimony." *Hendricks v. Cent. Reserve Life Ins. Co.*, 39 F.3d 507, 513 (4th Cir. 1994).

22

As discussed above, the district court concluded that Vandivere failed to meet his burden of proving he was no longer sexually dangerous after a consideration of the entire record, which included expert testimony, lay witness testimony, and evidentiary reports. The district court carefully evaluated the credibility of the witnesses and cogently explained its conclusions on the record. We have not been left with "the definite and firm conviction" that the district court erred in concluding Vandivere remained sexually dangerous. *Easley v. Cromartie*, 532 U.S. 234, 242 (2001). Instead, the district court's assessment of the evidence appears reasoned, balanced, and well-informed.

Vandivere nonetheless criticizes the district court for disregarding Dr. Rosell's opinion that hebephilia is not a valid basis for civil commitment, due to its exclusion from the DSM-V. However, this Court has already rejected that very same argument, holding that "the scope of 'illness, abnormality, or disorder' in § 4247(a)(6) is certainly broad enough to include hebephilia," and that "a mental disorder or defect need not necessarily be one so identified in the DSM in order to meet the statutory requirement." *United States v. Caporale*, 701 F.3d 128, 136–37 (4th Cir. 2012) (quoting *United States v. Carta*, 592 F.3d 34, 39–40 (1st Cir.2010)) (internal quotation marks omitted); *see also Hendricks*, 521 U.S. at 359 (holding that definitions of mental illness in civil commitment statutes need not track precise medical definitions).

Vandivere also protests that the district court erred in relying on the government's rare-bird theory. He asserts that the theory is entirely subjective and contradicts the weight of objective research that suggests a sex offender of Vandivere's age is highly unlikely to reoffend. But the question of whether a particular sex offender will reoffend requires more

23

than a consideration of general statistics about the mine-run of sex offenders. Instead, district courts are tasked with considering the personal proclivities of each offender and what these idiosyncrasies might indicate about his risk of reoffending. *See, e.g.*, *Charboneau*, 914 F.3d at 917 n.10; *United States v. Perez*, 752 F.3d 398, 408 (4th Cir. 2014); *United States v. Heyer*, 740 F.3d 284, 292–94 (4th Cir. 2014); *Hall*, 664 F.3d at 466. The district court was thus well within its discretion to evaluate the statistical evidence in light of Vandivere's own foibles, most notably his utter lack of remorse and persistent refusal to participate in sex offender therapy, and conclude that Vandivere remained sexually dangerous, despite his advanced age.

Finally, Vandivere asserts that the district court committed reversible error due to its "inadequate consideration of certain substantial evidence," namely, Vandivere's positive behavior during confinement. Appellant's Reply Br. 23 (quoting *United States v. Antone*, 742 F.3d 151, 165 (4th Cir. 2014)). He points out that all three experts agreed that Vandivere has not been a management problem while in custody, and that his last sexually based infraction was fifteen years ago. He argues that this demonstrates he can control his behavior. He therefore asserts that the district court's refusal to properly account for this evidence warrants reversal.

We reject this argument. The district court did consider Vandivere's behavior while in custody, but correctly noted that "there are no 13- to 15-year-old boys in the BOP." J.A. 298. Further, the court emphasized that Vandivere continued to demonstrate cognitive distortions about sexual abuse into the present, such as his belief that pubescent boys could validly consent to sex with an adult, that he refused to "even attempt" sex offender

24

treatment while in custody, and that his suggested release plan to live in Wilson's remote cabin was not "remotely acceptable." J.A. 295, 298–99.

Thus, we are far from a situation where the district court ignored "substantial evidence in the record indicating that [Vandivere] has developed a level of general and social self-regulation" and engaged in a "decade[s]-long process of rehabilitation." *Antone*, 742 F.3d at 167, 169. Nor is it the case that the district court reached its conclusions "by relying on a flawed expert opinion [or] by ignoring or otherwise failing to account for [a] substantial body of contradictory evidence." *Wooden*, 693 F.3d at 461. On the contrary, the record reflects that "the district court carefully considered the evidence before it, and its factual findings represent a permissible and reasonable interpretation of the evidence presented at the hearing." *United States v. Bolander*, 722 F.3d 199, 216 (4th Cir. 2013).

V.

We end with a brief observation on the peculiarity of civil commitment. We would be remiss if we did not comment on the oddity of a system that deprives individuals so fully of their liberty outside the context of criminal confinement. Indeed, the concept may strike one as unseemly in a society founded on higher notions of justice and redemption.

But we would also be remiss if we failed to acknowledge the horrid details of Vandivere's crimes. The callousness and cruelty with which he subjected his young victims to lifetimes of trauma cannot be dismissed here. We do not raise the brutality of his abuse to allude to some moralistic desire to make him pay for what he has done, however. He has already served his time in prison for that purpose. Rather, his past crimes inform what the district court understood it was protecting the public from in the present. In its view, the

25

risk of recurrence upon release had not dissipated, and we have no basis for upsetting the

trial court's judgment.

*AFFIRMED*